Todd Atkins
*tatkins@atkinsdavidson.com*
ATKINS & DAVIDSON APC
2261 Rutherford Road
Carlsbad, CA 92008
Telephone: (619) 665-3476

Matthew M. Wawrzyn
*matt@wawrzynlaw.com*
WAWRZYN LLC
200 East Randolph Street, Suite 5100
Chicago, IL 60601
Telephone: (312) 235-3120

*Attorneys for Cooperative Entertainment Inc.*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| COOPERATIVE ENTERTAINMENT INC.,<br><br>Plaintiff,<br><br>v.<br><br>KOLLECTIVE TECHNOLOGY, INC.,<br><br>Defendant. | Case No. 3:20-cv-07273-EJD<br><br>**Opposition to Motion to Dismiss**<br><br>Judge: Hon. Edward J. Davila<br>Date: May 6, 2021<br>Time: 9:00 a.m. |

## <u>Table of Contents</u>

*Claims 1, 5 (limitations added to claim 1 emphasized), 12, 13, 14, and 15*.........................1

*Statement of the Issues* ..........................................................................................3

*Introduction*..........................................................................................................3

*Background*............................................................................................................4

*Argument*.............................................................................................................11

I.      **The '452 patent claims teach one of ordinary skill in the art how to share digital content over a virtual, dynamic P2P network.** ..............................................11

        A.      **The '452 patent specifies a solution to the capacity problem.**
                ......................................................................................................12

        B.      **CEI adequately alleges an "inventive concept."**...................................14

        C.      **Kollective's cases feature patents claiming results rather than narrowly tailored to the solution**...............................................................................15

II.     **Plaintiff gives its competitor notice that the Kollective system infringes by streaming video over a dynamic network based on how the devices receive the streamed content**.........................................................................................18

*Conclusion*...........................................................................................................20

1

## Table of Authorities

2

*Aatrix Software, Inc. v. Green Shades Software, Inc.*,
    882 F.3d 1121 (Fed. Cir. 2018)………………………………………………………15

*Ancora Techs., Inc. v. HTC America, Inc.*,
    908 F.3d 1343 (Fed. Cir. 2018)………………………………………………………13

*BASCOM Global Internet Servs., Inc. v. AT&T Mobility LLC*,
    827 F.3d 1341 (Fed. Cir. 2016)………………………………………………………15

*Koninklijke KPN N.V. v. Gemalto M2M GmbH*,
    942 F.3d 1143 (Fed. Cir. 2019)…………………………………………………..12, 13

*PersonalWeb Tech. LLC v. Google LLC*,
    2020 WL 520618 (N.D. Cal. Jan. 31, 2020)…………………………………………11

*VideoShare, LLC v. Google Inc.*,
    2016 WL 4137524 (D. Del. Aug. 2, 2016)…………………………………………..17

3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Opposition to Motion to Dismiss                 iii                 Case No. 3:20-cv-07273-EJD

1    <u>**Claim 1**</u>

2    A system for virtualized computing peer-based content sharing
3    comprising:

4    at least one content delivery server computer constructed and
     configured for electrical connection and communication via at least
5    one communications network; and

6    at least one peer-to-peer (P2P) dynamic network including a
7    multiplicity of peer nodes, wherein the multiplicity of peer nodes
     consume the same content within a predetermined time, wherein
8    the multiplicity of peer nodes are constructed and configured for
     electronic communication over the at least one P2P dynamic
9    network, wherein the at least one P2P dynamic network is based on
     at least one trace route; wherein the multiplicity of peer nodes is
10   distributed outside controlled networks and/or content distribution
     networks (CDNs) that are included within the at least one
11   communications network;

12
     wherein the at least one content delivery server computer is
13   operable to store viewer information, check content request, use
     the trace route to segment requested content, find peers, and return
14   client-block pairs;

15
     wherein distribution of P2P content delivery over the at least one
16   P2P dynamic network is based on content segmentation;

17   wherein content segmentation is based on CDN address resolution,
     trace route to CDN and P2P server manager, dynamic feedback
18   from peers reporting traffic rates between individual peer and its
     neighbors, round-robin and other server side scheduling/resource
19   allocation techniques.

20
     <u>**Claim 5 (limitations added to claim 1 emphasized)**</u>
21

22   A method for virtualized computing peer-based content sharing
     comprising the steps of:
23

24   providing at least one content delivery server computer constructed
     and configured for electrical connection and communication via at
25   least one communications network;

26   providing at least one peer-to-peer (P2P) dynamic network
     including a multiplicity of peer nodes constructed and configured
27   for electronic communication over the at least one P2P dynamic

28   Opposition to Motion to Dismiss                1                Case No. 3:20-cv-07273-EJD

network, wherein the multiplicity of peer nodes consume the same content within a predetermined time, wherein the at least one P2P dynamic network is based on at least one trace route, wherein the multiplicity of peer nodes is distributed outside controlled networks and/or content distribution networks (CDNs) that are included within the at least one communications network;
the at least one content delivery server computer receiving at least one content request from a client;

the at least one content delivery server computer segmenting requested content based on CDN address resolution, trace route to CDN and the P2P server manager, dynamic feedback from peers reporting traffic rates between individual peer and its neighbors, round-robin, and other server side scheduling/resource allocation techniques;

*automatically identifying at least one peer node having at least one segment of the requested content in close network proximity to the client*; and

*at least one peer node most proximal to the client sharing the at least one segment of the requested content.*

## **Claim 12**

The method of claim 5, further including the step of the system automatically grouping clients into groups having between 5 and about 20 clients.

## **Claim 13**

The method of claim 5, further including the step of determining grouping of clients having common content based on a variety of metrics including CDN IP (routing table), QoS, ISP ID, and subnet id.

## **Claim 14**

The method of claim 5, further including the step of the system dynamically reassigning clients to other groups.

## Statement of the Issues

Whether the asserted patent claims teach one of ordinary skill in the art how to build a peer-based content sharing system that can stream video outside of a static network.

Whether plaintiff gives its competitor defendant notice of the accusation that defendant's streaming service infringes the asserted patent claims.

## Introduction

With the explosion of devices that consume digital content, cheaply and seamlessly delivering the content has been a challenge. One solution had been peer-to-peer, or P2P, file sharing. According to this method, a device that receives content from a server in turn acts as a server of the content to another device. The devices are referred to as "peers." By having the peers act as servers to other devices (peers), the network was relieved of some of the computing capacity needed to distribute the content.

The prior art P2P network was static. These legacy P2P networks received content directly from a content delivery network ("CDN") hub. The P2P network was within the control of the CDN. This prior art P2P network reduced capacity on the network only nominally and could not handle larger files such as video streaming.

Plaintiff's predecessor has a solution. Joosy creates dynamic P2P networks that exist outside of the "top down," static, controlled structure of the CDN. The solution more fully opens network capacity by offloading digital content distribution to the decentralized P2P network. In short, Joosy created a virtual distribution network among the peers. On this virtual network outside of the control of the broader network (CDN), the digital content could be seamlessly distributed in full.

Joosy created this solution using, among other things, a computer network diagnostic called a "traceroute." A traceroute is a command that measures transit delays along a network path. Joosy uses traceroutes to map the pathway to a particular piece of digital content that a device wants to consume. JoosyCloud—a commercialized embodiment of the patent-in-suit—establishes a dynamic P2P network according to a group of devices that want to consume the same piece of digital content within a predetermined time. More than this, the dynamic network that grows up around one thing—consuming the same piece of digital content—is governed on the fly according to the quality of the connection among the peers. In other words, the dynamic P2P network is self-governing according to how, for example, the video stream is coming through to the dynamic network as it is constituted at that point in time. The dynamic network is a reflection of the content being consumed—throughout the process.

This case is about Kollective practicing the Joosy method without a license. The amended complaint alleges that Kollective uses the virtual, dynamic P2P network of JoosyCloud and the patent.

For example, Kollective facilitates the distribution of a CEO's "state of the company" address to the entire global corporation. Kollective helps its customer form a dynamic P2P network—consisting of the corporation's employee computers consuming the "state of the company" address at the same time. In this way, the corporation's computers—which all consume the same digital content—shoulder the burden of distributing the content that will be consumed.

## **Background**

This section provides an overview of the patent and the amended complaint.

*U.S. Patent No. 9,432,452*

"The prior art fails to provide video streaming over P2P networks outside the structure and control of [Content Delivery Networks] CDNs" ('452, col. 3:35-36.) The patentee and the U.S. Patent Office reviewed the prior art that taught content delivery through peer-to-peer ("P2P") networks.

This prior art featured distributed CDNs that used "trace routes" as a tool to test pathways between and among the various computing devices that comprise a given network's architecture: "Weller's servers perform network traffic tests including traceroutes, pings, file downloads . . . to measure dynamic network conditions." (Ex. A (File History) at 000020.)

The '452 patent claims use these means of testing to further segment the actual content being delivered: "Specifically, traceroute as a type of network traffic test in Weller does not suggest or indicate using trace route to <u>segment</u> requested content." (*Id.*)

The U.S. Patent Office allowed the '452 patent claims for the following reason: "The prior arts of record, failed to disclose or suggest that the multiplicity of peer nodes of the dynamic peer-to-peer network consume the same content within a predetermined time and that the distribution of PTP content delivery is based on content segmentation and the content segmentation is based on CDN address resolution, trace route to CDN and P2P server manager, dynamic feedback from peers reporting traffic rates between individual peer and its neighbors, round robin and other server side scheduling/resource allocation techniques . . . ." (Ex. A (File History) at 00008.)

The '452 patent discusses some of the benefits of this novel technique: "Peer nodes or content recipients of the same content provide for redirected content delivery among peer nodes

(or users), thereby by-passing any established or static content delivery network (CDN); advantageously, this saves time, improves redundancy, and also reduces or eliminates costs for content delivery over the CDN for the peer nodes. The content delivery server further identifies those peer nodes that are in close proximity to each other and uses them to distribute content to each other to create more efficient content delivery thereby." ('452, col. 5:38-48.)

The '452 patent reversed the flow of distributed digital content. According to the prior art, the CDN server pushed the digital content from node to node. The '452 patent, on the other hand, derived "peerness" from common video content iteratively shared in segments throughout the P2P network: "The content recipients have a peerness established and/or defined by the common content they are receiving from the CDN server; the systems and methods automatically identify peer nodes receiving common content and create dynamic network communication connection for the peer nodes to transmit that common content to each other, rather than the content being directed from the CDN server directly to each recipient node." ('452 patent, col. 4:52-60.)

The '452 patent specifies how each peer is registered in each dynamic network. The patent teaches that each network should have between five and 20 peers. ('452, col. 6:51-7:14; *see also* claims 10, 11, and 12.)

The '452 patent teaches how to automatically group the peers that are consuming the same content based on network conditions: "Methods of the present invention include a step of determining grouping of clients having common content based upon a variety of metrics including CDN IP (routing table), QoS, ISP ID, and subnet id. The automatic determination of group size for the P2P dynamic networks according to the present invention is important for performance and ability to manage issues to a single or multiplicity of clients in the group but balanced by a need to reduce system resources needed to keep connections to all group members. Also, the

methods of the present invention further include the step of the system dynamically reassigning clients to other groups, for example as needed for reasons like dissolution of a group due to loss/lowering of group member count, splitting a group that grew too large, and QoS metrics dictated different grouping."

In other words, the dynamic network of peers changes automatically based on the condition of the dynamic network and how the peers are consuming the content. Claims 10 and 14 cover this teaching.

Claim 13 of the '452 covers one method of grouping of clients based on the metric of Quality of Service, or QoS, "the step of determining grouping of clients having common content based upon . . . QoS . . . ." ('452, col. 12:19-22.) "Also, the systems and methods of the present invention . . . include implementation of dynamic peer-to-peer (P2P) network-based, IP-based communication among peer nodes, wherein the peerness of the peer nodes is defined by their common content." "FIG. **14** is a schematic diagram of the invention illustrating use cases for a submit report function that further includes the steps of update QoS for stream source and log client performance." (*Id.*, col. 9:9-12.)

The '452 patent claims all require segmenting the digital content according to the trace routes. ('452, FIGS. 2-9 and accompanying disclosure at col. 8:6-32.) Furthermore, each claim, standing alone, contains the necessary components that deliver the result of a virtual P2P sharing method and system.

For example, Claim 1 is, "A system for virtualized computing peer-based content sharing . . . ." ('452, col. 10:25-26.) "Virtualized" means creating another layer or environment: "The systems and methods of the present invention provide for harnessing the content recipient devices to aggregate or assemble intelligent functionality of the devices unassociated with the content

receipt, including but not limited to computational storage and processing capacity of the content recipient devices in the P2P dynamic network, as in grid computing applications for massively parallel computation in addition to the P2P content distribution and redundancy of the online content distribution to receiving or recipient peer node devices." ('452, col. 9:54-63.) Claim 1, like all the claims, covers the virtual layer outside the control of the prior art distribution scheme pushed from the CDN.

The claim 1 system includes: "content delivery server computer constructed and configured for electrical connection and communication via at least one communications network . . . ." ('452, col. 10:27-29.) Claim 1 also has the following limitation,"the multiplicity of peer nodes consume the same content within a predetermined time . . . [and the P2P network] is based on at least one trace route . . . ." (*Id.*, col. 10:30-37.)

Claim 1's backend functions as follows: "content delivery server computer is operable to store viewer information, check content request, use the trace route to segment requested content, find peers, and return client-block pairs . . . ." ('452, col. 10:42-45; *see also* FIG. 1.) "[W]herein distribution of P2P content delivery . . . is based on content segmentation . . . based on CDN address resolution, trace route to CDN and P2P server manager, dynamic feedback from peers reporting traffic rates between individual peer and its neighbors, round-robin and other server side scheduling/resource allocation techniques." (*Id.*, col. 10:46-54; *see also* FIGS. 3-8.)

*Amended complaint*

**Plaintiff alleges that the '452 patent is eligible for patent**. Plaintiff alleges that the claims are directed to solving the problems inherent in the static, redundant, prior P2P networks. (Dkt. No. 18 (Am. Compl.) ¶¶ 11-13.)

The '452 patent claims teach a dynamic, decentralized P2P network. (Dkt. No. 18 (Am. Compl.) ¶ 14.)

The claims, claim 13, for example, cover how to most efficiently group the various peers consuming the same content into a particular dynamic network. (Dkt. No. 18 (Am. Compl.) ¶¶ 16-17.)

The '452 patent uses traceroutes to segment the digital content. (Dkt. No. 18 (Am. Compl.) ¶ 18.)

The dynamic P2P network is outside the control of the CDN and thus "virtual." (Dkt. No. 18 (Am. Compl.) ¶¶ 19-21.)

The virtual network manages distribution based on content segmentation based on "trace route to CDN," among other techniques. (Dkt. No. 18 (Am. Compl.) ¶ 22.)

The single prerequisite for the peer to join the dynamic network is consumption of the same digital content: "the 'peerness' . . . is not physical location-dependent, control-dependent, or ownership-dependent . . . ." (Dkt. No. 18 (Am. Compl.) ¶ 22.) Plaintiff alleges that JoosyCloud source code practices the required elements of claims 1 and 5 of the '452 patent. (*Id.*)

Plaintiff alleges that the '452 patent claims solve the problem of capacity where the prior art P2P systems had failed. (Dkt. No. 18 (Am. Compl.) ¶¶ 24, 25.)

**Plaintiff alleges that the Kollective application SD ECDN infringes claims 1, 2, 3, and 5 of the '452 patent**.

Plaintiff alleges that Kollective has a corporation as a customer. This customer wants to deliver a "state of the company" address by the CEO. Plaintiff alleges that Kollective provides the corporation an app. Through this app, "Kollective forms a dynamic network among the devices

that will consume the corporate-wide broadcast of the company CEO." (Dkt. No. 18 (Am. Compl.) ¶¶ 26, 29, 34.)

Plaintiff alleges that Kollective sells to customers like this corporation discussed above a dynamic P2P network that relieves capacity constraints. "The central servers and agents collectively form an adaptive, distributed content delivery and caching system to ensure that upwards of 99% of content is delivered via controlled, localized, east-west traffic instead of across the more constrained wide-area and internet gateway links often referred to as north-south traffic." (Dkt. No. 18 (Am. Compl.) ¶ 36.)

Kollective's dynamic network adapts based on network conditions as taught in the '452 patent. "SD ECDN's *adapt* mechanisms are a key driver of the solution's success in a multivariate network environment. With dynamic peer quality adapting to network bandwidth throttle impacts, the system is able to thrive and deliver. . . ." (Dkt. No. 18 (Am. Compl.) ¶¶ 29, 37.)

Amended complaint: "SD ECDN's backend includes the functionality claimed in the '452 system and method: 'Device management settings that maintain the balance between increased performance and prevention of adverse impact to resources across all elements of the system." *Id.* "The connection between one network device to the next is called a hop. The number of such hops, known as a hop count, is a measure of the network distance between two devices and has a bearing on latency. Setting the peering rules to include hop counts and/or latency gives control over how the mesh behaves while still allowing for it to optimize within the boundaries of the established rules.'" (Dkt. No. 18 (Am. Compl.) ¶ 38.)

Plaintiff alleges that Kollective segments content. (Dkt. No. 18 (Am. Compl.) ¶ 39.) This is Kollective's description of its app: "The agents in the mesh are constantly aware of their

network surroundings. Utilizing pings and traceroutes, they gather key information about the surrounding network by monitoring the location of other agents and constantly gauging how local area links are performing." (*Id.*) Kollective creates dynamic networks based on network performance and consumption of the same content. Kollective's words: "For live streaming, the mesh should be somewhat aggressive in the way it sources content from peers and the way it competes for bandwidth. Agent settings can be set accordingly for those use cases." (*Id.*) "'The Kollective SD ECDN is powerful in its ability to perform specific actions as governed by the use case and ensure that the mesh attains the desired balance of performance and network load.'" (*Id.*)

Plaintiff also alleges an example that Kollective sells on its websites to customers: "When Kollective's client delivers its corporate-wide address, the address is streamed video content delivered to a dynamic P2P network comprising the company devices consuming the content." (Dkt. No. 18 (Am. Compl.) ¶ 39.)

### Argument

*Standard of Review*

"The question of whether a claim element or combination is well-understood, routine, and conventional to a skilled artisan in the relevant field is a question of fact and thus any fact that is pertinent to the invalidity conclusion must be proven by clear and convincing evidence." *PersonalWeb Tech. LLC v. Google LLC*, 2020 WL 520618, Case No. 5:13-cv-01317-EJD, *12 (N.D. Cal. Jan. 31, 2020).

I.    **The '452 patent claims teach one of ordinary skill in the art how to share digital content over a virtual, dynamic P2P network.**

These patent claims are eligible under section 101 because they are directed to a specific way that improves the legacy P2P networks.

Opposition to Motion to Dismiss               11               Case No. 3:20-cv-07273-EJD

1
2
3
4
5
6

The inventive concept of the '452 patent is to use traceroutes to identify common content that will be consumed by the peers and then segmenting and distributing the content based on the traceroute. The patent examiner found that the prior art did not do this. That finding is presumed correct and, separately, is alleged in the amended complaint and should be accepted by the Court as true at the pleading stage.

7
8
9
10
11

Kollective glosses over the dynamic aspect of the '452 patent claims. According to Kollective, this patent claims a garden-variety P2P network. Kollective misrepresents the patent in an attempt to fit the patent into a "preparing content" category that other courts have invalidated. The '452 patent covers a virtual, dynamic P2P network. The '452 patent is addressed to a better way of content sharing.

12
13

**A. The '452 patent specifies a solution to the capacity problem.**

14
15
16

The Federal Circuit has reversed district courts that granted motions to dismiss and motions for judgment on the pleadings, holding that these non-abstract claims improved the prior art.

17
18
19
20
21
22
23
24
25
26

For example, in one case, the claims covered a non-abstract improvement of the functionality of an existing technological process. *Koninklijke KPN N.V. v. Gemalto M2M GmbH*, 942 F.3d 1143, 1146 (Fed. Cir. 2019). The Court of Appeals reversed the district court's grant of judgment on the pleadings for the defendant, holding that the claims required a refinement of the prior art systems: the non-abstract claims "replace the prior art check data generator with an improved, dynamic check data generator that enable increased detection . . . ." *Id.* at 1146. "In the present case, the appealed claims recite a sufficiently specific implementation (i.e., modifying the permutation applied to the original data 'in time') of an *existing tool* (i.e., check data generating

27
28

Opposition to Motion to Dismiss                    12                    Case No. 3:20-cv-07273-EJD

device) that improves the functioning of the overall technological process of detecting systemic errors in data transmissions." *Id.* at 1151 (emphasis added).

Similar to the inventors who modified the input of data to the check data device in *Koninklijke*, here the patentee took an existing tool—traceroutes used to test the pathway between and among nodes—and used that existing tool to make something new. The patentee used the trace route to instead perform the content segmentation. (Ex. A (File History) at 1; *see also Ancora Techs., Inc. v. HTC America, Inc.*, 908 F.3d 1343, 1348-49 (Fed. Cir. 2018) (reversing district court because, *inter alia*, file history supported inventive concept).

In *Ancora*, the asserted patent claims related to protecting against unauthorized use of computer programs ("hacking"). *Id.* at 1345-46. The claims required storing a verification structure for the computer programs in a component that existed in the prior art—the Basic Input Output System (the "BIOS"). *Id.* at 1345-46. The district court granted the defendant's motion to dismiss, reasoning that the claims were not focused on an improvement, but rather using the BIOS for storing data, the BIOS's typical use. *Id.* at 1346.

The Federal Circuit reversed. "The claimed method here specifically identifies how that functionality improvement is effectuated in an assertedly unexpected way: a structure containing a license record is stored in a particular, modifiable, non-volatile portion of the computer's BIOS, and the structure in that memory location is used for verification by interacting with the distinct computer memory that contains the program to be verified." *Ancora*, 908 F.3d at 1348-49.

Similarly, CEI's predecessor, the patentee, taught those of ordinary skill in the art how to manipulate the prior art systems in a new, unexpected way: using the means of testing the pathways instead as a means to distribute data in a virtual network outside the control of the CDN. Harnessing the virtual network in this way led to improved, novel results: "Peer nodes or

content recipients of the same content provide for redirected content delivery among peer nodes (or users), thereby by-passing any established or static content delivery network (CDN); advantageously, this saves time, improves redundancy, and also reduces or eliminates costs for content delivery over the CDN for the peer nodes. The content delivery server further identifies those peer nodes that are in close proximity to each other and uses them to distribute content to each other to create more efficient content delivery thereby." ('452, col. 5:38-48.)

As the Federal Circuit has taught in the cases discussed above, the patent claim is *not* directed to an abstract idea if the claim is narrowly tailored to the solution, like claims 1 and 5.

**B.     CEI adequately alleges an "inventive concept."**

"At *Mayo* step two, we must examine the elements of the claim to determine whether it contains an 'inventive concept' sufficient to 'transform' the claimed abstract idea into a patent-eligible application. 566 U.S. at ---, 132 S. Ct. at 1294 . . . ." *Alice*, 573 U.S. at 221. "*Mayo* made clear that transformation into a patent-eligible application requires 'more than simply stat[ing] the [abstract idea] while adding the words 'apply it'." *Id.*

Here, claim 1 shows one of ordinary skill in the art how to implement the "inventive concept" of segmenting content in a virtual P2P network using the tools of the CDN on the backend. Indeed, Claim 1 provides, "[W]herein distribution of P2P content delivery . . . is based on content segmentation . . . based on CDN address resolution, trace route to CDN and P2P server manager, dynamic feedback from peers reporting traffic rates between individual peer and its neighbors, round-robin and other server side scheduling/resource allocation techniques." (*Id.*, col. 10:46-54; *see also* FIGS. 3-8.)

For example, the Federal Circuit reversed the district court's grant of a motion to dismiss, holding, "There are concrete allegations in the second amended complaint that individual

elements and the claimed combination are not well-understood, routine, or conventional activity. There are also concrete allegations regarding the claimed combination's improvement to the functioning of the computer. We have been shown no proper basis for rejecting those allegations as a factual matter." *Aatrix Software, Inc. v. Green Shades Software, Inc.*, 882 F.3d 1121, 1128 (Fed. Cir. 2018); *see also BASCOM Global Internet Servs., Inc. v. AT&T Mobility LLC*, 827 F.3d 1341, 1350 (Fed. Cir. 2016) (reversing grant of motion to dismiss: "[C]onstrued in favor of the nonmovant . . . the claims may be read to 'improve[] an existing technological process.'").

As in *Aatrix*, the amended complaint specifically alleges that the '452 patent discloses an "inventive concept" that was recognized and subsequently upheld by the U.S. PTO. (Dkt. 18 (Am. Compl.) ¶¶ 12, 13.) Moreover, CEI's predecessor showed in his patent claims how to implement the "inventive concept."

On this motion to dismiss, these allegations must be construed in CEI's favor. *Aatrix*, 882 F.3d at 1128; *BASCOM*, 827 F.3d at 1350.

Finally, plaintiff alleges that its predecessor wrote source code that embodies all of the limitations of claims 1 and 5. (Dkt. 18 (Am. Compl.) ¶ 23.)

**C.     Kollective's cases feature patents broadly claiming results rather than narrowly tailored to solutions.**

Kollective reduces the '452 patent to simply preparing content for delivery on the Internet. (Dkt 19 (Mot.) at 4.) This argument ignores what the '452 patent claims. The '452 patent is directed to a method and system of sharing content, not preparing the content to be shared: "A system for virtualized computing peer-based content sharing comprising . . . one content delivery server . . . one peer-to-peer (P2P) dynamic network . . . the multiplicity of peer nodes consume the same content within a predetermined time . . . ."

The dynamic P2P network is based on the peers consuming the same content, but the '452 patent takes the content as it is: "It will be appreciated by one of ordinary skill in the art that the embodiments of the present invention described herein assume the use of existing audio and/or video playback. Advantageously, this corresponds to systems and methods for P2P content distribution among peers of a dynamic network or sub-network without requiring new compression or playback for efficient distribution. Furthermore, the content distributed via the peer nodes of the present invention does not establish the 'peerness' or the P2P connections is not physical location-dependent, control-dependent, or ownership-dependent . . . ." ('452, col. 5:11-21.)

Kollective misrepresents the '452 patent when Kollective states, "The patent applicant made clear . . . the components of the claimed system were conventional." (Dkt 19 (Mot.) at 4.) The specification teaches that because the '452 patent takes the content as it is—irrespective of who owns or controls the content—conventional software on a content consumer's device will work with the patented method: "no customized or proprietary software download to the peer node content recipient devices is required . . . ." ('452, col. 5:64-67.)

Another inaccurate statement by Kollective: "[T]he applicant indicated that any conventional P2P network may be used to implement data sharing." (Dkt. 19 (Mot.) at 5.) The cited passage from the '452 patent says the opposite: "The present invention relates to peer-to-peer (P2P) dynamic networks and/or sub-networks, wherein nodes are outside controlled networks and/or content distribution networks (CDNs), and wherein large data files are distributed or shared across and among the peer nodes." ('452, col. 3:40-44.) Kollective tells the Court the patent is a conventional P2P, and then cites to a description of the '452 patent's improvement to the prior art.

Kollective ignores the allegations related to patent eligibility and therefore waives any arguments.

On a motion to dismiss, plaintiff's allegations regarding the reason for allowance—novel use of traceroutes—should be accepted as true. Similarly, plaintiff controls source code that embodies claims 1 and 5. This is pled and should be accepted as true at this stage of the case to demonstrate eligibility and an inventive concept.

Compare the detailed engineering requirements of claim 1 (e.g., content segmentation via CDN address resolution, trace route to CDN and P2P server manager, etc.) with the claim held invalid in *VideoShare, LLC v. Google Inc.*, No.13-cv-00990, 2016 WL 4137524 (D. Del. Aug. 2, 2016).

Kollective tries to minimize claim 1 to meet the *VideoShare* claim. That claim broadly sought to capture the result of streaming content over the Internet: "A method of streaming a video to users over a network . . . receiving . . . a video file . . . converting the video file into a streaming video file . . . ." *Id.* at *1. Instead of claiming a result, claim 1 of the '452 patent defines specific things the artisan must do in order to share content via a virtualized P2P network, including content segmentation and the specific means to reach the desired end of a virtual network.

Kollective's analysis is untethered to the language of the claims. The '452 patent creates and maintains a dynamic P2P network based on the peers consuming the same content: "segmenting requested content based on CDN address resolution, trace route to CDN and the P2P server manager, dynamic feedback from peers reporting traffic rates between individual peer and its neighbors, round-robin, and other server side scheduling/resource allocation techniques . . . ." (Claim 5.) In other words, the content is distributed to the group consuming the same content at

the same time in the best way according to network conditions. Kollective overlooks these requirements by characterizing the '452 patent as a prototypical P2P network.

Kollective lumps claims 1 and 5 together: "Claim 5 merely describes performing steps of the system described in Claim 1 . . . ." (Dkt. 19 (Mot.) at 5.) This is incorrect. Claim 5 adds two limitations—automatically identifying proximate peers and sharing content with proximal peers. Kollective admits to ignoring whole claim limitations.

Kollective gives examples of result-based claiming held to be invalid under section 101. Those cases do not apply. CEI's patent shows one of ordinary skill in the art precisely how to program and configure the system. See, for example, Figures 11 through 14 and the accompanying disclosure in the patents-in-suit.

Kollective repeatedly asserts that CEI makes use of generic computing components. To do this, Kollective ignores the written description, which teaches how to implement the virtual network. (*See supra* at 5-8.) Kollective ignores the disclosure of how to segment the content. (*Id.* at 7.) Kollective ignores the file history, where the U.S. Patent Office found that no one had done these things before. (Ex. A.)

**II.     Plaintiff gives its competitor Kollective notice that the Kollective system infringes by streaming video over a dynamic network based on how a group of devices consume the video stream.**

The amended complaint alleges infringement with two different sources.

First, Kollective has a video advertisement on its website.[1] The amended complaint summarizes this ad:

---

[1] https://kollective.com/kollective-scales-teams/ (two minute video re Tom & Jerry)

Plaintiff alleges that Kollective has a corporation as a customer. This customer wants to deliver a "state of the company" address by the CEO. Plaintiff alleges that Kollective provides the corporation an app. Through this app, "Kollective forms a dynamic network among the devices that will consume the corporate-wide broadcast of the company CEO." (Dkt. No. 18 (Am. Compl.) ¶¶ 26, 29, 34.)

Kollective dismisses the allegations regarding the "state of the company" address as "largely unintelligible." (Dkt. 19 (Mot.) at 19.) By not responding, Kollective has waived any arguments regarding the "state of the company" allegations.

What part of this is unintelligible? "Through the Kollective app, Kollective forms a dynamic network among the devices that will consume the corporate-wide broadcast of the company CEO." (Dkt. No. 18 (Am. Compl.) ¶ 29.)

The amended complaint is clear that all of the devices consume the content at the same time, as claimed in the '452 patent.

Second, plaintiff uses quotes from a Kollective white paper to allege that Kollective sells to customers like this corporation discussed above a dynamic P2P network that relieves capacity constraints. "The central servers and agents collectively form an adaptive, distributed content delivery and caching system to ensure that upwards of 99% of content is delivered via controlled, localized, east-west traffic instead of across the more constrained wide-area and internet gateway links often referred to as north-south traffic." (Dkt. No. 18 (Am. Compl.) ¶ 36.) This is one of the allegations that goes to the dynamic P2P network outside the control of the "north-south" network.

The quotes from the white paper meet each claim's other limitations. Kollective's dynamic network adapts based on network conditions as taught in the '452 patent. "SD ECDN's

*adapt* mechanisms are a key driver of the solution's success in a multivariate network environment. With dynamic peer quality adapting to network bandwidth throttle impacts, the system is able to thrive and deliver. . . ." (Dkt. No. 18 (Am. Compl.) ¶¶ 29, 37.)

The amended complaint alleges that Kollective's backend provides the network management limitations of the '452 patent claims: "'Device management settings that maintain the balance between increased performance and prevention of adverse impact to resources across all elements of the system. *Id.* The connection between one network device to the next is called a hop. The number of such hops, known as a hop count, is a measure of the network distance between two devices and has a bearing on latency. Setting the peering rules to include hop counts and/or latency gives control over how the mesh behaves while still allowing for it to optimize within the boundaries of the established rules.'" (Dkt. No. 18 (Am. Compl.) ¶ 38.)

Plaintiff alleges that Kollective segments content. (Dkt. No. 18 (Am. Compl.) ¶ 39.) This is Kollective's description of its app: "The agents in the mesh are constantly aware of their network surroundings. Utilizing pings and traceroutes, they gather key information about the surrounding network by monitoring the location of other agents and constantly gauging how local area links are performing." (*Id.*) Kollective creates dynamic networks based on network performance and consumption of the same content. Kollective's words: "For live streaming, the mesh should be somewhat aggressive in the way it sources content from peers and the way it competes for bandwidth. Agent settings can be set accordingly for those use cases." (*Id.*) "'The Kollective SD ECDN is powerful in its ability to perform specific actions as governed by the use case and ensure that the mesh attains the desired balance of performance and network load.'" (*Id.*)

### Conclusion

Plaintiff respectfully requests that the Court enter an order denying the motion.

Dated: <u>March 5, 2021</u>

/s/ Todd Atkins

Todd C. Atkins (SBN 208879)
tatkins@atkinsdavidson.com
ATKINS & DAVIDSON, APC
2261 Rutherford Road
Carlsbad, CA 92008
Telephone: (619) 665-3476

Matthew M. Wawrzyn
matt@wawrzynlaw.com
WAWRZYN LLC
200 Randolph Street, Suite 5100
Chicago, IL 60601
Telephone:  312.235.3120
Facsimile: 312.233.0063

*Attorneys for Cooperative Entertainment Inc.*

Opposition to Motion to Dismiss                    21                    Case No. 3:20-cv-07273-EJD